# Illinois Official Reports

## Appellate Court

---

### *Rosenberger v. United Community Bancshares, Inc.*, 2017 IL App (1st) 161102

---

| | |
|---|---|
| Appellate Court Caption | TERRANCE J. ROSENBERGER, Plaintiff-Appellant and Cross-Appellee, v. UNITED COMMUNITY BANCSHARES, INC., Successor by Merger to Commercial Bancshares Corporation, a Delaware Corporation, Defendant-Appellee and Cross-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-16-1102 |
| Filed | February 24, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-2807: the Hon. James E. Snyder, Judge, presiding. |
| Judgment | Reversed and remanded; cross-appeal dismissed. |
| Counsel on Appeal | Jeffrey Ogden Katz, Michael Haeberle, and Stephanie Simpson, of Patterson Law Firm, of Chicago, for appellant.<br><br>Kathryn Montgomery Moran and Sean C. Herring, of Jackson Lewis P.C., of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.<br>Justices Rochford and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1     The plaintiff, Terrance J. Rosenberger, filed the instant action against the defendant, United Community Bancshares, Inc. (UCB), successor by merger to Commercial Bancshares Corporation, alleging it breached his employment contract by failing to pay him severance benefits. The circuit court granted UCB's motion for summary judgment, finding that the doctrine of legal impossibility excused its performance since the severance benefits amounted to a "golden parachute," which is prohibited by section 1828(k)(1) of the Federal Deposit Insurance Act (FDIA) (12 U.S.C. § 1828(k)(1) (2012)). Rosenberger appeals, arguing that the court erred in granting summary judgment because he falls within the so-called "white knight" exception to the prohibition against golden parachute payments. UCB cross-appeals, contending in the alternative that summary judgment was appropriate because Rosenberger's employment was terminated for cause, thus precluding his entitlement to severance benefits. For the reasons which follow, we dismiss UCB's cross-appeal, reverse the circuit court's judgment, and remand for further proceedings.

¶ 2     The following factual recitation is taken from the pleadings, affidavits, and depositions of record.

¶ 3     UCB, successor by merger to Commercial Bancshares Corporation, is a bank holding company, and CenTrust Bank, N.A. (CenTrust) is a wholly owned subsidiary of UCB that operates a community bank in Northbrook, Illinois. As a member of the Federal Deposit Insurance Corporation (FDIC), CenTrust is subject to FDIC regulations.

¶ 4     Prior to the events at issue here, in 2011, Rosenberger and James McMahon became interested in investing in a community bank after the bank they previously worked at, Park National Bank, failed. Rosenberger and McMahon, along with a third individual, Gerard Buccino, formed a company, United Financial Holdings Group, Inc. (United Financial), for the purpose of raising capital and acquiring a majority interest in a troubled community bank in the Chicago area.

¶ 5     Rosenberger and McMahon identified CenTrust as a candidate for acquisition. According to a "Strategic Plan," CenTrust was founded in 2006, and by 2008, losses quickly emerged as a result of a "global liquidity crisis" that impacted the United States and local economies. Due to the declining value of commercial real estate, CenTrust experienced losses, which required additional capital to be committed to its loan-loss reserves. At some point, the Office of the Comptroller of the Currency (OCC) entered into an "Operating Agreement" with CenTrust, subjecting it to heightened regulatory oversight.

¶ 6     In January 2012, after months of planning and negotiating with UCB and federal regulators, United Financial entered into a Stock Purchase Agreement with UCB, whereby CenTrust would receive $7 million in new capital and Rosenberger, McMahon, and Buccino would be hired as CenTrust's new management team. The $7 million in new capital improved CenTrust's capital reserves above the minimum "Tier 1" regulatory levels.

¶ 7     On February 1, 2012, UCB hired Rosenberger to serve as CenTrust's chief lending officer. His employment agreement provided an initial term of three years with a base salary of $200,000 per year, subject to annual increases in "an amount not less than the increase to the Consumer Price Index for the prior twelve months." Rosenberger's compensation package also included a car allowance, reimbursement of country club and athletic club dues, a 401(k) plan,

and discretionary bonuses. Relevant here, section 4(e) of the employment agreement entitled Rosenberger to severance benefits:

> "(e) Severance Compensation. If this Agreement is terminated by the Company prior to the expiration of the Employment Period for any reason other than Cause, *** then the Employee shall be entitled to receive in a single payment *** an amount equal to two times his annual base salary then in effect."

Section 16 of the employment agreement defined "cause," in pertinent part, as "the failure to follow the Company's reasonable instructions with respect to the performance of the Employee's duties." Section 3 of the employment agreement, in turn, defined Rosenberger's duties as follows:

> "3. Duties. Employee shall serve as Chief Lending Officer of the Company and will, under the direction of the Board of Directors, faithfully and to the best of his ability perform the duties of President [*sic*] and Chief Lending Officer of the Company as assigned by the Board of Directors from time to time."

Although a termination without cause entitled Rosenberger to a lump sum severance payment, section 28(e) of the employment agreement provided that: "Any payments made to Executive pursuant to this Agreement, or otherwise, are subject to and conditioned upon their compliance with Section 18[28](k) [of the FDIA] (12 U.S.C. § 1828(k))."

¶ 8 On July 25, 2012, following a regulatory examination by the OCC, CenTrust consented to the entry of an order ("Consent Order"), which required it to acquire and maintain increased amounts of capital, reduce the level of nonperforming loans, and improve its operations. The Consent Order set forth various duties required of the board of directors and management to bring CenTrust into compliance with banking regulations. As a result of the Consent Order, CenTrust was designated an institution in "troubled condition." See 12 C.F.R. § 303.101(c) (2012).

¶ 9 On April 13, 2013, Rosenberger received an annual performance evaluation for 2012. In the evaluation, an executive committee of UCB's board of directors stated that it was not satisfied with Rosenberger's performance, finding his due diligence on "loan and OREO" to be "poor" and the lack of loan growth "not acceptable." It further noted that "booking new, quality loans" is "critical to the overall value of the organization" and that "Rosenberger occasionally fails to exhibit proficiency in some of his responsibilities." The executive committee acknowledged, however, that Rosenberger "followed" the board of directors' policies and procedures and the provisions of the July 25, 2012, Consent Order.

¶ 10 On August 19, 2013, the executive committee provided Rosenberger with a "mid-year review." In that review, the executive committee observed that Rosenberger's "pipeline of new loans is increasing" but that the "new loans actually funded are seriously deficient and must be increased." Although the executive committee "offered suggestions" to generate new loans—*e.g.*, opening "an office in Hinsdale solely for loans" and implementing "an active local calling program"—it did not specifically instruct Rosenberger to follow through on those suggestions.

¶ 11 In a memorandum dated October 15, 2013, the executive committee informed Rosenberger that he was underperforming and not "meeting [his] duties pursuant to Paragraph 3 of [his] Employment Agreement." According to the memo, the Bank budgeted approximately $56

million in new loans to be funded through September 30, 2013, but only $35 million had been funded, running a negative variance of over $20 million. The executive committee stated:

> "As a result, the [executive committee] is not satisfied with the performance of your duties as Chief Loan Officer and wishes to immediately implement a performance correction plan regarding your employment. These steps are taken in an effort to improve the performance of your duties and in accomplishing the Company's overall goals of generating new loans and becoming profitable.
>
> Below are areas of serious deficiencies in key areas where the [executive committee needs to see substantial improvement by year-end and would like a weekly progress report from you relating to the following items[.]"

The performance correction plan, as set forth in the October 15, 2013, memorandum, goes on to list, in 17 bullet points, the "Key Areas/ Reasonable Instructions" that Rosenberger was to address in his weekly progress report. Following the list of bullet points, the executive committee stated as follows:

> "Terry, the [executive committee] is eager to have you remedy these matters promptly and no later than the end of this quarter, December 31, 2013, and would welcome a meeting to further discuss this Performance Correction Plan. Please feel free to contact Jim McMahon or Harry Stinespring to schedule a meeting upon your receipt and review of this letter."

¶ 12 On October 21, 2013, Rosenberger accepted the executive committee's invitation and met with McMahon and Stinespring to discuss the performance correction plan. According to Rosenberger's affidavit, he told McMahon and Stinespring that he believed the performance correction plan was unreasonable since his performance was being evaluated against a budget that was drafted in February 2013 without his input, was not approved by the OCC, and was superseded by an August 2013 budget. He also believed that the executive committee's request for weekly progress reports was unreasonable since monthly reporting is the industry standard. Nevertheless, he informed McMahon and Stinespring that he intended to respond, in writing, to the executive committee's performance correction plan.

¶ 13 In a letter addressed to the executive committee, dated October 30, 2013, Rosenberger criticized its decision to judge his performance based upon "an unreasonable budget" that was rejected by the OCC "as imprudent and placing the Bank at risk of failure." He disputed the executive committee's assertion that he had not fulfilled his duties under the employment agreement and noted that, aside from his alleged underperformance with respect to the loans, the performance correction plan failed to identify how he did not to perform his duties. Rosenberger concluded the letter by stating:

> "*I will work with whomever the [executive committee] designates to develop an efficient format for the weekly reports requested in the 'Performance Correction Plan*[.]' ***.
>
> ***
>
> The Performance Correction Plan is an arbitrary document based on an incorrect assumption to the Bank's budget and is an ill-designed attempt to 'make a record' to support some future action. For the reasons above, the Performance Correction Plan is rejected, although *I will work with the [executive committee] on weekly reporting and prioritizations*." (Emphases added.)

- 4 -

¶ 14 Six days later, on November 5, 2013, UCB's board of directors terminated Rosenberger's employment. A letter that Rosenberger received stated that UCB "hereby terminates the [Employment] Agreement for cause effective immediately." The letter did not state any reasons for the termination of his employment.

¶ 15 In March 2014, Rosenberger filed a single-count complaint in the circuit court of Cook County against UCB, alleging breach of contract. He asserted that UCB breached his employment agreement by failing to increase his salary on February 1, 2013, by 1.6%, the amount the consumer price index increased over the prior twelve months; failing to reimburse him for his country club dues; and refusing to pay him $406,400 in severance benefits.

¶ 16 In its answer to the complaint, UCB denied the allegations that it failed to increase Rosenberger's salary or reimburse him for his country club dues. It admitted, however, that it had not tendered payment of severance benefits. As affirmative defenses, UCB alleged, *inter alia*, that its performance was excused under the doctrine of legal impossibility because Rosenberger's severance would be a "golden parachute payment," which is barred by section 1828(k) of the FDIA (12 U.S.C. § 1828(k) (2012)). UCB also asserted that Rosenberger is not entitled to severance benefits under the terms of the employment agreement as he was discharged for cause.

¶ 17 In August 2015, UCB moved for "partial summary judgment" on Rosenberger's claim for severance benefits.[1] In its motion, UCB did not dispute that Rosenberger's employment agreement was a valid and enforceable contract or that Rosenberger had not been paid the severance benefits provided for in section 4(e) of that agreement. Rather, UCB asserted that Rosenberger seeks to recover a golden parachute payment that is prohibited by federal banking regulations. According to UCB, under applicable federal regulations, banks in "troubled condition" are barred from making golden parachute payments without the consent of the appropriate federal banking agency and the written concurrence of the FDIC. Since there is no evidence that either the OCC or FDIC consented to the payment of Rosenberger's severance benefits, UCB contends it is impossible for it to perform without violating federal banking regulations. Alternatively, UCB argued that summary judgment in its favor is appropriate because there is no genuine issue of material fact that Rosenberger was discharged for cause and, as a consequence, he is not entitled to severance benefits under the terms of the employment agreement. UCB supported its motion with the deposition testimony of McMahon and Rosenberger, the employment agreement, the Consent Order, the performance evaluations, and written correspondence between Rosenberger and the executive committee.

¶ 18 In opposing the motion, Rosenberger conceded that the golden parachute provisions of the FDIA apply to his severance benefits. He argued, however, that a question of fact was created based upon evidence that he was hired as a "white knight" to rescue CenTrust from economic failure and, therefore, falls within an exception to rules prohibiting golden parachute payments. He further asserted that UCB should have applied to the appropriate federal agency for an exception to the golden parachute regulation and that its failure to do so was a breach of

---

[1]Actually, UCB's motion was a motion for a summary determination of major issues pursuant to section 2-1005(d) of the Code of Civil Procedure (735 ILCS 5/2-1005(d) (West 2014)). It is not a motion for partial summary judgment, which permits a party to seek the entry of summary judgment on one or more, but less than all, of the counts of a multicount complaint. 735 ILCS 5/2-1005(a)-(c) (West 2014); *Chicago Transit Authority v. Clear Channel Outdoor, Inc.*, 366 Ill. App. 3d 315, 323 (2006).

the implied duty of good faith and fair dealing. Finally, Rosenberger disputed UCB's contention that he was discharged for "cause" as defined in section 16 of the employment agreement. Rosenberger relied upon the same evidentiary material as UCB and, in addition, attached his own affidavit.

¶ 19        On December 22, 2015, Rosenberger voluntarily dismissed his claims for unpaid salary and country club dues, leaving only his claim for severance pay.

¶ 20        On March 28, 2016, the circuit court granted UCB's motion for "partial" summary judgment, finding that any severance payment would constitute a prohibited golden parachute, thereby rendering UCB's performance legally impossible. The court observed that, while there is some evidence in the record suggesting that Rosenberger qualified as a "white knight," there is no evidence that federal regulators consented to the payment and, absent consent, UCB is prohibited from paying Rosenberger his severance benefits. Because the court previously granted Rosenberger's motion to voluntarily dismiss his claims for unpaid compensation and country club dues, the summary judgment entered on the issue of legal impossibility was the equivalent of a summary judgment entered on the entire remaining complaint. As to UCB's contention that Rosenberger is not entitled to severance pay based upon his termination for "cause," the court determined that summary judgment in UCB's favor on that ground was not appropriate. This appeal followed.

¶ 21        As a preliminary matter, we note that UCB's cross-appeal asks this court to affirm the circuit court's summary judgment ruling on alternative grounds. However, as our supreme court has explained, "[a] party cannot complain of error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked for in the trial court cannot appeal from the judgment." *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386 (1983). Thus, where the circuit court grants summary judgment in favor of a party, that party cannot file a cross-appeal to seek relief from the summary judgment order. *Dowe v. Birmingham Steel Corp.*, 2011 IL App (1st) 091997, ¶ 25. For that reason, we must dismiss UCB's cross-appeal. We note, however, we consider the arguments it raises in its cross-appeal since "an appellee may argue in support of the judgment on any basis which appears in the record." *Hayes v. Board of Fire & Police Commissioners*, 230 Ill. App. 3d 707, 710 (1992).

¶ 22        As this matter comes to us on appeal from the entry of summary judgment, our review is *de novo*, applying the same legal standards as did the circuit court. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15. Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits on file establish the absence of a genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014); *Sollami v. Eaton*, 201 Ill. 2d 1, 6 (2002). The purpose of a motion for summary judgment is to determine the existence or absence of a genuine issue as to any material fact; it cannot be used to resolve a disputed fact. *Illinois State Bar Ass'n Mutual Insurance Co. v. Law Office of Tuzzolino & Terpinas*, 2015 IL 117096, ¶ 14. When ruling on a motion for summary judgment, the court must strictly construe all evidentiary material against the movant while liberally construing all of the evidentiary material in favor of the opponent. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). If the evidentiary material before the court could lead to more than one reasonable conclusion or inference, the court must adopt the conclusion or inference which is most favorable to the opponent of the motion. *Brandt v. Time Insurance Co.*, 302 Ill. App. 3d 159, 164 (1998). Summary judgment is a drastic remedy which

results in the disposition of a case without a trial and, as such, should not be granted unless the right of the movant is free from doubt. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12.

¶ 23    As his sole assignment of error, Rosenberger argues that the circuit court erred in granting summary judgment in UCB's favor because a genuine issue of material fact exists on the question of whether UCB's performance under section 4(e) of the employment agreement was excused under the doctrine of legal impossibility.

¶ 24    "The doctrine of legal impossibility, or impossible performance, excuses performance of a contract only when performance is rendered *objectively* impossible either because the subject matter is destroyed or by operation of law." (Emphasis added.) *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 37. The doctrine has been narrowly applied based upon judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances. *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill. App. 3d 1, 6 (2010). One particular example of impossibility excusing performance is an intervening governmental regulation or order. Restatement (Second) of Contracts § 264 (1981). Significantly, however, the doctrine does not apply to excuse performance as long as it lies within the power of the promisor to remove the obstacle to performance. *Downs v. Rosenthal Collins Group, L.L.C.*, 2011 IL App (1st) 090970, ¶ 39. The party advancing the doctrine has the burden of proving impossibility. *Michigan Avenue National Bank v. State Farm Insurance Cos.*, 83 Ill. App. 3d 507, 514 (1980).

¶ 25    In this case, UCB's impossibility defense is based upon section 1828(k)(1) of the FDIA. Under the FDIA and its implementing regulations, the FDIC "may prohibit or limit, by regulation or order, any golden parachute payment." 12 U.S.C. 1828(k)(1) (2012); see also 12 C.F.R. § 359.0 *et seq.* (2012). As is relevant here, a golden parachute is:

> "any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution *** for the benefit of any institution-affiliated party pursuant to an obligation of such institution *** that—
>
> > (i) is contingent on the termination of such party's affiliation with the institution ***; and
> > (ii) is received on or after the date on which—
> > > * * *
> > > (III) the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition (as defined in the regulations prescribed pursuant to section 1831i(f) of this title)[.]" 12 U.S.C. § 1828(k)(4)(A) (2012).

An "[i]nstitution-affiliated party" (IAP) includes "[a]ny director, officer, employee, or controlling stockholder *** of *** an insured depository institution or depository institution holding company." 12 C.F.R. § 359.1(h)(1) (2012). By regulation, no insured depository institution or depository institution holding company may make or agree to make a golden parachute payment, except as provided by the express regulatory process. 12 C.F.R. § 359.2 (2012).

¶ 26    Although Rosenberger concedes that the severance benefits provided for in his employment agreement constitute a golden parachute, he argues that UCB cannot rely upon the impossibility defense because he qualifies under the "white knight" exception to the

prohibition against golden parachute payments. More specifically, he asserts that UCB cannot rely on the impossibility defense because it had the ability to seek government approval for the severance payment but had failed to do so.

¶ 27   As Rosenberger correctly observes, section 1828(k) does not prohibit all golden parachute payments. Rather, section 1828(k)(2) grants authority to the FDIC to develop regulations for determining which termination payments should, and should not, be made. The FDIC regulations set forth limited exceptions for a depository institution or depository institution holding company, such as UCB, to make what would otherwise be a prohibited golden parachute payment. Specifically, a golden parachute payment may be made if and to the extent that:

> "(1) The appropriate federal banking agency, with the written concurrence of the [FDIC], determines that such a payment or agreement is permissible; or

> (2) Such an agreement is made in order to hire a person to become an IAP either at a time when the insured depository institution or depository institution holding company satisfies or in an effort to prevent it from imminently satisfying any of the criteria set forth in § 359.1(f)(1)(ii), and the institution's appropriate federal banking agency and the Corporation consent in writing to the amount and terms of the golden parachute payment. ***; or

> (3) Such a payment is made pursuant to an agreement which provides for a reasonable severance payment, not to exceed twelve months salary, to an IAP in the event of a change in control of the insured depository institution; provided, however, that an insured depository institution or depository institution holding company shall obtain the consent of the appropriate federal banking agency prior to making such a payment ***[.]" (Emphasis omitted.) 12 C.F.R. § 359.4(a)(1)-(3) (2012).

¶ 28   Qualifying for any of these exceptions requires a two-step process. First, the applicant or Rosenberger must certify to the appropriate federal banking agency that:

> "it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe, at the time such payment is proposed to be made, that:

> (i) The IAP has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to the depository institution or depository institution holding company that has had or is likely to have a material adverse effect on the institution or holding company;

> (ii) The IAP is substantially responsible for *** the troubled condition, as defined by applicable regulations of the appropriate federal banking agency, of the insured depository institution, depository institution holding company or any insured depository institution subsidiary of such holding company;

> (iii) The IAP has materially violated any applicable federal or state banking law or regulation that has had or is likely to have a material effect on the insured depository institution or depository institution holding company[.]" 12 C.F.R. § 359.4(a)(4)(i)-(iii) (2012).

¶ 29   Second, and notwithstanding the fact that the requisite certifications (as outlined in 12 C.F.R. § 359.4(a)(4) (2012)) have been made, the FDIC "may consider" the following in exempting certain payments from the golden parachute restrictions:

"(1) [w]hether, and to what degree, the IAP was in a position of managerial or fiduciary responsibility;

(2) [t]he length of time the IAP was affiliated with the insured depository institution or depository institution holding company, and the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment; and

(3) [a]ny other factors or circumstances which would indicate that the proposed payment would be contrary to the intent of section 18(k) of the [FDIA] or this part." 12 C.F.R. § 359.4(b)(1)-(3) (2012).

¶ 30    Under the regulations, either UCB or Rosenberger could have applied to the FDIC and the OCC for a determination that the severance pay provided in section 4(e) of Rosenberger's employment agreement is permissible.[2] However, there is nothing in the record suggesting that either UCB or Rosenberger ever requested the FDIC and the OCC to approve disbursement of the severance payments.

¶ 31    In urging reversal of the circuit court's grant of summary judgment, Rosenberger asserts that the severance payment could be approved by the FDIC because he qualifies under the "white knight" exception in 12 C.F.R. § 359.4(a)(2) (2012). Accordingly, Rosenberger maintains that an impossibility defense is not available to UCB, as it could have secured regulatory approval to pay the severance payment under the employment agreement. He cites *Hill v. Commerce Bancorp, Inc.*, No. 09-3685(RBK/JS), 2012 WL 694639 (D.N.J Mar. 1, 2012), in support of his argument.

¶ 32    In *Hill*, a former executive sued for breach of his employment contract after his former employer, Commerce Bancorp, refused to pay his severance allowance. The bank moved for summary judgment arguing that it could not pay the executive's severance package because such payment would constitute a golden parachute prohibited under the FDIA. It also argued that the severance package did not fall under any of the enumerated exceptions to the golden parachute regulations. *Id.* at *2. In denying the bank's motion for summary judgment, the district court began its analysis by noting that both parties were "equally eligible to apply for the exception to the golden parachute restrictions, as long as they are able to certify to the [points in 12 C.F.R. § 359.4(a)(4)]," but that neither party submitted an application. *Id.* at *7. Although the court was "perplexed" by the executive's refusal to even consider filing the application himself, the court nevertheless found a genuine issue of material fact as to whether it was objectively impossible for the bank to perform under the contract by seeking agency approval for the golden parachute payment. *Id.* at *10. The court reasoned that the bank failed to present any evidence demonstrating that it could not make the requisite certification under section 359.4(a)(4). Specifically, the bank presented no evidence demonstrating that it had a

---

[2]The employment agreement did not obligate either Rosenberger or UCB to obtain the FDIC's approval. That is, neither party expressly agreed that they would obtain the necessary government approval. Consequently, we cannot say that either party was solely responsible for satisfying the condition precedent and assumed the risk of failing to do so. This is not to say, however, that the parties had no obligation to seek the FDIC's approval. Although the employment agreement did not require UCB to obtain the FDIC's approval, we believe that UCB was still bound by the implied covenant of good faith and fair dealing to seek the required authorization. See *Martinez v. Rocky Mountain Bank*, 540 Fed. App'x 846, 851 (10th Cir. 2013).

reasonable basis to believe that the executive engaged in a disqualifying act that " 'has had or is likely to have a material adverse effect' on [the bank]." *Id.* at *9 (quoting 12 C.F.R. § 359.4(a)(4)(i) (2012)). Thus, because "there remain[ed] a genuine question of material fact as to whether or not [the bank is] able to make the *** certification[s] [necessary to apply for an exception], [the bank] cannot be afforded summary judgment on their contractual impossibility defense." *Id.* at *10.

¶ 33        Similarly, here, UCB presented no evidence demonstrating that it applied for an exception to make the severance payment. Nor has UCB pointed to any evidence showing that it could not make the necessary certification under section 359.4(a)(4). Indeed, McMahon testified in his deposition that he is not aware of any fraudulent acts or omissions committed by Rosenberger, and he denied that Rosenberger committed any breach of fiduciary duty, insider abuse, or violated any federal or state banking law or regulations. He also stated that Rosenberger was not responsible for UCB's troubled condition. Thus, McMahon's testimony, coupled with the fact that there is no evidence in the record that Rosenberger engaged in a disqualifying act that "has had or is likely to have a material adverse effect" on UCB (see 12 C.F.R. § 359.4(a)(4)(i) (2012)), creates a genuine issue of material fact as to whether UCB could have sought and received agency approval for the severance payment to Rosenberger. See *Hill*, 2012 WL 694639, at *9; *cf. Rohr v. Reliance Bank*, 826 F.3d 1046, 1053 (8th Cir. 2016) (summary judgment appropriate where employee failed to submit any evidence to rebut the bank's evidence showing that it could not make the certification).

¶ 34        We conclude, therefore, that the circuit court erred in granting summary judgment in UCB's favor on grounds that its performance under the employment agreement was rendered objectively impossible by operation of law.

¶ 35        Having found that UCB is not entitled to summary judgment on grounds of contractual impossibility, we next address UCB's contention that, pursuant to the terms of the employment agreement, Rosenberger is not entitled to severance benefits since he was terminated for cause.

¶ 36        We begin by noting that the parties do not argue that the employment agreement is ambiguous. "Where the terms of an agreement are unambiguous, the parties' intent must be determined solely from the language of the agreement itself, and it is presumed that the parties inserted each provision deliberately and for a purpose." *Jameson Realty Group v. Kostiner*, 351 Ill. App. 3d 416, 426 (2004). The terms of an agreement, if unambiguous, should generally be enforced as they appear, and those terms will control the rights of the parties. *Batson v. The Oak Tree, Ltd.*, 2013 IL App (1st) 123071, ¶ 35.

¶ 37        In this case, the employment agreement permitted UCB to terminate Rosenberger's employment for cause. Section 16 of the employment agreement defined "cause," in pertinent part, as "the failure to follow the Company's reasonable instructions with respect to the performance of the Employee's duties."

¶ 38        "Generally, the burden is on the employer to prove that the employee was guilty of conduct justifying termination." *Staton v. Amax Coal Co.*, 122 Ill. App. 3d 631 (1984). Moreover, whether an employee engaged in misconduct or disobeyed reasonable orders, is a question for the trier of fact to resolve. *Mitchell v. Jewel Food Stores*, 142 Ill. 2d 152, 165 (1990); *Lukasik v. Riddell, Inc.*, 116 Ill. App. 3d 339, 346 (1983).

¶ 39        Here, UCB asserts that it terminated Rosenberger for cause based upon his failure to follow reasonable instructions. Specifically, it claims that the undisputed evidence shows that Rosenberger "disagreed with and rejected" the performance correction plan and failed to

follow the executive committee's reasonable instructions to provide it with weekly progress reports.

¶ 40     Based upon our review of the record, we find that genuine issues of fact exist as to whether Rosenberger failed to follow the executive committee's instructions, as set forth in the performance correction plan dated October 15, 2013, to provide it with weekly progress reports. The record contains evidence demonstrating that Rosenberger met with McMahon and Stinespring on October 21, 2013, to discuss the performance correction plan, and in a letter to the executive committee, dated October 30, 2013, he stated that he "will work with whomever the [executive committee] designates to develop an efficient format for the weekly reports." Although Rosenberger expressed willingness to follow the executive committee's instructions, his employment was terminated six days later on November 5, 2013. Based on this evidence, reasonable minds could differ as to whether Rosenberger failed to follow the executive committee's instructions relating to weekly progress reports. We conclude, therefore, that a genuine issue of material fact exists as to whether Rosenberger's conduct constituted cause for UCB to terminate his employment.

¶ 41     For the foregoing reasons, we conclude that the circuit court erred in granting summary judgment in UCB's favor. We, therefore, reverse the circuit court's judgment and remand for further proceedings. UCB's cross-appeal is dismissed.

¶ 42     Reversed and remanded; cross-appeal dismissed.