2022 IL App (1st) 210138

FIRST DISTRICT
SIXTH DIVISION
March 18, 2022

No. 1-21-0138

| 55 JACKSON ACQUISITION, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 M1 705666 |
| | ) | |
| ROTI RESTAURANTS, LLC, | ) | Honorable |
| | ) | Martin P. Moltz, |
| Defendant-Appellee. | ) | Judge presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff 55 Jackson Acquisition, LLC (Jackson), brought suit against defendant Roti Restaurants, LLC (Roti), seeking (in relevant part) unpaid rent pursuant to a lease of commercial premises. Roti counterclaimed for breach of contract, seeking abatement of its rent. Upon cross-motions for summary judgment, the trial court granted summary judgment for Roti. On appeal, Jackson contends that the court erred in granting summary judgment for Roti because (1) the doctrines of impossibility or commercial frustration do not excuse a restaurant from paying rent during the COVID-19 pandemic where public health orders never required restaurants to close and (2) the court excused Roti from paying rent though no provision of the lease justified it. Roti responds that the summary judgment was proper because (1) the doctrines of impossibility, impracticability, and frustration of purpose justified it and (2) COVID-19 was a casualty under the lease provision on fire and other casualties. For the reasons stated below, we reverse the summary judgment for Roti and remand for further proceedings on the complaint and counterclaim.

¶ 2                           I. JURISDICTION

¶ 3     On Jackson's complaint and Roti's counterclaims, the trial court granted summary judgment for Roti on January 8, 2021, and Jackson filed its notice of appeal on Monday, February 8, 2021. Thus, this court has jurisdiction in this matter pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017) governing appeals in civil cases.

¶ 4                           II. BACKGROUND

¶ 5     In 2016, Jackson's predecessor in interest as owner of a building in downtown Chicago (Building) and Roti entered into a lease (Lease) for particular space (Premises) in the Building, commencing on or about January 1, 2017, and running 12 years unless otherwise terminated. In the Lease, Jackson and Roti are referred to as Landlord and Tenant respectively.

¶ 6     The Lease provides for monthly base rent at a specified amount for each of the 10 years of the Lease—in relevant part, $13,365 in the fourth year and $13,632 in the fifth year—due on the first day of each month with a $200 late fee if not paid by the fifth of the month. It also provides for additional rent of Roti's share—0.5235% based on the Premises being 2159 rentable square feet in the Building of 412,437 rentable square feet—of landlord's taxes and operating expenses for the Building. "If there is any physical change to the Building or the Premises which causes the rentable area to change, Landlord shall adjust the figures appropriately, and the additional rents payable shall be appropriately prorated to reflect the change in rentable area."

¶ 7     Under the Lease, Roti may "use the Premises for the operation of a restaurant which sells food for on and off premises consumption, including the sale of beer, liquor and wine, and ancillary items found in Tenant's other stores, and for such ancillary uses as are found in other Roti establishments." As long as Roti is "operating as a Mediterranean theme restaurant," Landlord "shall not permit to be operated anywhere within the Building, any restaurant or food service

business, that shall primarily sell Mediterranean cuisine centered around pitas, fire-roasted meats, shawarma, hummus, falafel, and couscous." The Lease obligates Roti "to conduct and operate said business in a proper, lawful, and reputable manner" and to "comply in all matters with all laws, ordinances, rules, regulations, orders, and public authorities or officers exercising any power of regulation or supervision over Tenant or the Premises, or the use or operation thereof." Roti also "will not make or permit any use of the Premises which, directly or indirectly, is forbidden by public law, ordinance or governmental or municipal regulation or order, or which may be dangerous to life, limb, or property."

¶ 8     Section 3.02 of the Lease, titled "Operation of Business," provides:

"Landlord acknowledges that Tenant does not have an obligation under this Lease to continuously operate at the Premises. In the event Tenant abandons the Premises during the term of this Lease for a period in excess of ninety (90) days, unless due to Tenant actively remodeling, casualty, condemnation or force majure [*sic*] while continuing to pay all Rent set forth herein, then Landlord shall have the option to terminate the Lease by written notice to Tenant, provided that such written notice is given to Tenant prior to its reopening for business. Notwithstanding the foregoing, Tenant shall have the right to nullify Landlord's termination notice pursuant to this Section 3.02 by reopening the Premises within fifteen (15) days after Tenant's receipt of Landlord's termination notice."

¶ 9     Section 5.05 of the Lease, titled "Rent Abatement," provides that:

"Notwithstanding anything to the contrary contained herein, if, as a result of the negligence or willful misconduct of Landlord, its agents or employees, there is (i) an interruption or discontinuance in the furnishing by Landlord of any of the aforementioned services to the Premises, or (ii) an unreasonable interruption or interference of Tenant's use or operations on the Premises caused by Landlord's repair or other work ***, either of which results in

- 3 -

Tenant being unable to operate at the Premises, and Tenant is closed at the Premises, for a period in excess of three (3) consecutive days after notice to Landlord by Tenant, the monthly Base Rent required under this Lease shall abate from the date of such interruption until the earlier of the date Tenant reopens at the Premises or such time as the service is restored such that Tenant is again reasonably able to operate at the Premises."

¶ 10    Section 11.01 of the Lease, on "Destruction of Premises" by "Fire or Casualty," provides: "If the Premises or the Building (including machinery or equipment used in its operation) shall be damaged by fire or other casualty covered by insurance, and if such damage does not render all or a substantial portion of the Building untenantable, then Landlord shall repair and restore the same with reasonable promptness. If any such damage renders all or a substantial portion of the Premises or of the Building, untenantable, Landlord shall, within thirty (30) days after the occurrence of such damage estimate the length of time that will be required to substantially complete the repair and restoration of such damage and shall by notice advise Tenant of such estimate. If such estimate is that the amount of time required to substantially complete such repair and restoration will exceed one hundred eighty (180) days from the date such damage occurred, then either the Landlord or Tenant (but as to Tenant, only if all or a substantial portion of the Premises are rendered untenantable) shall have the right to terminate this Lease effective as of the date of such damage upon giving notice to the other at any time within twenty (20) days after Landlord gives Tenant the notice containing said estimate (it being understood that Landlord may, if it elects to do so, also give such notice of termination together with the notice containing such estimate). Unless this Lease is terminated as provided in the preceding sentences, Landlord shall proceed with reasonable promptness to repair and restore the Premises and the Building, subject to reasonable delays for insurance adjustments and delays caused by

matters beyond Landlord's reasonable control, and also subject to zoning laws and building codes then in effect. Notwithstanding anything to the contrary herein set forth, Landlord shall have no liability to Tenant, however, in the event all or a substantial portion of the Premises are rendered untenantable by such casualty, and such repairs and restoration are not in fact completed by the later to occur of (i) the time period estimated by Landlord, as aforesaid, or (ii) within said one hundred eighty (180) days, Tenant may terminate this Lease by written notice given by Tenant to Landlord said notice to be served to Landlord within five (5) days following the later to occur of (i) and (ii) above, said termination to be effective thirty (30) days after notice provided, however, if Landlord shall substantially complete its restoration or repairs within said thirty (30) day period, said notice shall become null and void and this Lease shall continue in full force and effect.

In the event any such damage not caused by the act or neglect of Tenant, its agents or servants, renders the Premises untenantable and if this Lease shall not be cancelled and terminated by reason of such damage, then the rent (including Base Rent and Additional Rent) shall abate during the period beginning with the date of such damage and ending one hundred twenty (120) days after the Premises has been delivered to Tenant with Landlord's Work completed and the Premises and Building are again rendered tenantable, or upon Tenant's re-opening for business in the Premises if sooner. Such abatement shall be in an amount bearing the same ratio of the total amount of rent for such period as the untenantable portion of the Premises from time to time bears to the entire Premises."

¶ 11    While Landlord's remedies for breaches of the Lease include terminating the Lease, Tenant's remedies for breaches of the Lease do not. The Lease provides that the prevailing party shall recover for reasonable costs, including attorney fees, from the non-prevailing party.

¶ 12                                A. Complaint

¶ 13    Jackson filed its verified complaint for eviction in August 2020, alleging that Roti rented space in Jackson's Building and was the tenant and occupant of that space at the time of the complaint. The Lease was attached to the complaint. Jackson alleged that it performed all its duties under the Lease while Roti had failed to pay monthly rent under the Lease since March 2020. Jackson sent Roti by certified mail in early July 2020 a five-day notice demanding payment of unpaid rent, but Roti allegedly failed to pay as demanded. Jackson prayed for an order of possession, unpaid rent of $79,173.88 as of the time of the complaint, and attorney fees and costs as provided in the Lease. Attached to the complaint was the verification of Jackson's property manager for the Building, Marie Jackimowicz, and copies of the notice and proof of service.

¶ 14                          B. Answer and Counterclaim

¶ 15    Roti appeared in early November 2020 and filed its verified answer with affirmative defenses and counterclaim in December 2020. Attached thereto was the verification of Roti's chief executive officer Justin Seamonds.

¶ 16    In its answer, Roti admitted that it was a party to the Lease but denied that it breached the Lease, averring "that by mandate of certain Public Health Orders, and in compliance with the terms of the Lease, Roti was essentially dispossessed of the Premises starting in March, 2020."

¶ 17    Roti's affirmative defenses alleged that the "State of Illinois and the City of Chicago, which have jurisdiction over the Premises, acting in response to the public health emergency caused by the COVID-19 pandemic, have mandated Public Health Orders affecting the Premises. Those Public Health Orders are a mandate of law, and that law can be found at" websites specified in the

answer. Roti "closed the premises" on March 18, 2020, in "response to the Public Health Orders," and "would have had to disobey the Public Health Orders to operate the Premises as a fully-functional restaurant, Roti's only permitted use at the Premises." Also, unrest beginning May 28, 2020, "caused many businesses in Illinois and the Chicagoland area to protect themselves from looting and rioting" that "caused business interruptions for many Chicago businesses "throughout the summer." Roti's operation of the Premises was "devastated," including broken windows and damaged Roti property at the Premises on May 30 and August 9, 2020. Both the public health orders and the unrest "made it illegal and impossible or impracticable for Roti to operate a restaurant at the Premises as anticipated under the Lease, its sole permitted use of the Premises."

¶ 18   Roti's first affirmative defense was impossibility or impracticability, stating that "[t]he purpose for which the Lease was made (namely, leasing a commercial space for operation of Roti's restaurant)" was "rendered impossible or impracticable" by the public health orders and unrest. "Thus, by operation of law, Roti was forced to shut down its normal restaurant operations at the Premises rendering it objectively impossible or impracticable to continue performance under the Lease." Both circumstances were unforeseeable when the Lease was formed, and the absence of a force majeure provision in the Lease meant "the common law of impossibility and impracticability controls." Therefore, "Roti's performance under the Lease, including but not limited to any obligation to pay rent, is excused and abated for as long as the COVID-19 pandemic, public health emergency, and Public Health Orders, and civil unrest and rioting, continue."

¶ 19   The second affirmative defense was frustration of purpose or commercial frustration. Because "Roti expected to use and occupy the Premises without interruption or interference for the entire term of the Lease" when it entered into the Lease, the public health orders and unrest "have frustrated the central purpose of the Lease—that is occupation of the Premises to conduct a fully operational Roti restaurant," which it is unable to operate. Therefore, "Roti's performance

under the Lease, including but not limited to any obligation to pay rent, must be excused and abated *** for as long as the COVID-19 pandemic, public health emergency, and Public Health Orders, and civil unrest and rioting, continue."

¶ 20    The third affirmative defense sought rent abatement under the Lease's rentable area and casualty provisions, arguing that Jackson "is bound by the Lease to abate rent in the event any casualty damage not caused by the act or neglect of Tenant renders the Premises untenantable." Roti alleged that a casualty includes direct physical loss or damage, that a dangerous substance can cause direct physical loss or damage, and that the COVID-19 virus is such a dangerous substance. Because of the public health orders, "Roti is unable to use the Premises for its intended purpose." As to the rentable-area provision, Roti alleged that the "casualty has rendered the Premises untenantable, and thus 100% of the Base Rent and Additional Rent must be abated *** until Roti re-opens for business in the Premises."

¶ 21    Roti's fourth and fifth affirmative defenses were mitigation and breach of good faith. The former alleged that Jackson was obligated to mitigate its damages but had not done so. The latter alleged that Jackson "has abused its discretion under the Lease and breached its covenant of good faith and fair dealing by the conduct alleged herein, including, but not limited to, not giving rent abatements owed under the Lease and the law," which was "unreasonable, improperly motivated, arbitrary, capricious, and not within the reasonable expectations of the parties."

¶ 22    Roti's counterclaim had two counts. Count I alleging breach of contract stated that Jackson breached the Lease and the implied covenant of good faith (1) because Roti could no longer use the Premises as a restaurant as the Lease provided; (2) by Jackson failing to abate rent under the doctrines of impossibility, impracticality, and frustration of purpose; and (3) by Jackson failing to abate rent under the Lease's rentable-area and casualty clauses. Count II of the counterclaim sought a declaratory judgment that Jackson (1) breached the Lease provision that Roti could use the

Premises as a restaurant; (2) failed to abate rent under the doctrines of impossibility, impracticality, and frustration of purpose; and (3) failed to abate rent under the Lease's rentable-area and casualty clauses. Both counts sought a judgment that Roti's rent was abated and an award of attorney fees.

¶ 23                                    C. Answer to Counterclaim

¶ 24    Jackson answered Roti's affirmative defenses and counterclaim. Jackson generally denied the allegations of the affirmative defenses and counterclaim except to admit that the Lease was in effect and says what it says. Jackson admitted that Roti closed its restaurant on the Premises on March 18, 2020, but denied Roti's characterizations of why it did so except to acknowledge that COVID-19 and the unrest occurred. While Jackson admitted that the windows of the Premises were broken as alleged, Jackson alleged that it fixed the windows at its expense and without reimbursement by Roti. Attached to Jackson's answer was Jackimowicz's certification.

¶ 25                          D. Roti's Motion for Summary Judgment

¶ 26    Roti filed its motion for summary judgment in December 2020 before Jackson filed its answer to the affirmative defenses and counterclaim. Roti claimed that it closed the Premises on March 18, 2020, pursuant to the public health orders, which made it "impossible or impractical to open or operate in any capacity while maintaining Public Health Order-mandated social distancing, whether between customers, employees or both," so that it "would have to disobey the Public Health Orders to operate the Premises as a fully-operational restaurant, Roti's only permitted use at the Premises." Roti reiterated its argument that the COVID-19 pandemic constitutes a "casualty" under the Lease provision on rent abatement for casualties. Roti added that this court has upheld rent abatement while government orders barring the only lawful use of the rented premises are in effect. See *Levy v. Johnston & Hunt*, 224 Ill. App. 300 (1922). Roti argued that *Levy* governs because the Lease has no *force majeure* provision.

¶ 27    Attached to the motion was Seamonds's December 2020 sworn statement, not notarized but certified pursuant to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2018)). Seamonds stated that, as Roti's chief executive officer, he was familiar with all of Roti's restaurants including the one on the Premises and the Lease concerning that restaurant. COVID-19 came to Seamonds's attention in early 2020, and "[b]y March, 2020, I became aware that Roti's restaurants would be severely impacted by this public health emergency, with some locations being required to close part or all of their operations, and at a minimum be subject to numerous operational constraints, in the interest of and to protect public health."

¶ 28    The effect of the public health orders on the restaurant on the Premises "was devastating, due to the nature of the business and strictures of the Public Health Orders. Compliance with applicable Public Health Orders, including but not limited to social distancing, made it impossible and impractical for Roti to operate the [Building] [l]ocation. Roti was entirely frustrated as to its purpose of operating a fully-functional restaurant." Thus, "it was impractical to operate, and Roti's purposes in renting this location - to operate a fully-functional restaurant - were frustrated." "Shut down under these circumstances was Roti's only practical alternative" because "full operations in this location would be a clear violation of Public Health Orders (which would also breach the terms of the lease), endangering customers and employees." Roti closed the Premises on March 18, 2020, and was "unable to reopen it since, as it remains impossible and impractical to operate the location and comply with Public Health Orders, including maintaining social distancing."

¶ 29    Seamonds stated that Roti applied "measures from careful sanitation to assiduous social distancing" in its open locations so that "to our knowledge, no one has become seriously ill or died from COVID-19 due to working for or purchasing and consuming food from Roti." That said, "it was impossible or at the very least impractical to operate the [Building] [l]ocation as we had intended, and keep our employees and customers safe and comply with Public Health Orders."

Indeed, he opined that "[a]ny Landlord who asserts to the contrary either lacks knowledge about the restaurant industry, knowledge about the Public Health Orders, or is indifferent to the health and safety of Roti's employees and customers and the public at large."

¶ 30 Also attached to the motion was a copy of *Levy*, where a landlord sued to collect rent from a saloon pursuant to a lease that restricted use of the premises to a saloon selling alcoholic beverages. *Levy*, 224 Ill. App. at 301-02. The saloon operator claimed that the federal prohibition statutes rendered illegal the sole use of the premises allowed by the lease. *Id.* at 302-03. The trial court found for the saloon operator, and this court affirmed. After rejecting the landlord's argument that a "saloon" has meanings other than a tavern so that the tenant had other uses of the premises available, finding that in the context of the lease it referred to the sale of alcoholic beverages (*id.* at 304-05), this court found that legislation had rendered performance of the lease impossible and thus excused. *Id.* at 305-08. In doing so, this court distinguished cases where the tenant was not excused because the uses of the premises were not restricted to a single purpose. *Id.* at 307-08.

¶ 31                         E. Jackson's Cross-Motion

¶ 32 Jackson filed a cross-motion for summary judgment and response to Roti's summary judgment motion. Jackson reiterated the claims in its complaint: Roti was obligated by the Lease to pay rent on the Premises but had not done so since March 2020, and a five-day notice was sent to Roti but it still did not pay rent. As to Roti's claims that its obligations should be excused and its rent abated, Jackson argued that "Roti has made a conscious choice to keep its restaurant closed. That is its right, but it does not excuse Roti from paying rent under the Lease."

¶ 33 The purposes of the Lease were not rendered impossible, unlike the saloon in *Levy*. Noting that the Lease allows Roti to use the Premises as a "restaurant which sells food for on and off premises consumption," Jackson argued that the public health orders "restricted capacity in restaurants or limited indoor dining. However, at no point in time has it been *illegal* to operate a

restaurant." (Emphasis in original.) While the saloon owner in *Levy* would be breaking the law by selling alcoholic beverages as the lease restricted, "Roti would not be violating any laws by continuing to sell food and beverages so long as it limits indoor capacity." Specifically, while indoor dining was prohibited as of the December 2020 motion, the public health orders and the Lease both allowed Roti to employ outdoor dining, takeout, and delivery. Indeed, many restaurants were open not only in Chicago generally but in the Building during the pandemic. Jackson argued that Seamonds's assertion that it was impossible to operate a "fully-functional" restaurant in compliance with the public health orders was self-serving and conclusory.

¶ 34    Jackson argued that the threshold for impossibility and commercial frustration are high, so that making business more difficult and less profitable is insufficient. Against *Levy*, Jackson cited *Deibler v. Bernard Bros., Inc.*, 385 Ill. 610 (1944), where the supreme court rejected the contention that an automobile dealership was excused from its lease obligations because wartime restrictions halted the production of new automobiles.

¶ 35    Jackson also argued that the pandemic is not a "casualty" under the Lease. Section 11.01 of the Lease concerns when the Premises or Building are "damaged by fire or other casualty covered by insurance." This "is not the open-ended catch-all that Roti would like the Court to believe; instead, it covers insured damages only." While the Lease requires Jackson purchase insurance for fire, vandalism, and liability for death or injury, it does not require insurance for COVID-19 or other pandemics. The same section requires Jackson to repair and restore the damaged Premises or Building, but Jackson cannot "repair Covid-19's hypothetical impact within the Premises." Lastly, the Lease section at issue provides for abatement if the Premises are rendered untenantable, but the Premises could still be used for non-indoor-dining restaurant purposes.

¶ 36   In support of Jackson's cross-motion, it filed Jackimowicz's December 2020 statement, styled an affidavit but certified pursuant to section 1-109. She stated that, as property manager for the Building, "I have personal knowledge regarding the various tenants at the [Building] and the terms of the leases for those tenants," including Roti's Lease of the Premises. "I have been routinely working out of my office at the [Building] during the Covid-19 pandemic and have seen numerous restaurants in the vicinity of the [Building] that have continued to remain open and operating during the Covid-19 pandemic." Indeed, at the Building "other tenants operate restaurants or cafes," including "a Potbelly and Starbucks" that "are currently open for business and have been open during much of the pandemic." While the Lease requires Jackson "to obtain certain types of insurance. Jackson is not required to "have any insurance that covers damages caused by Covid-19 or other pandemics" and does not have such insurance. Jackimowicz "reviewed Roti's rent ledger," a copy of which was attached, and concluded that Roti's amount due on the first day of 2021 would be $181,485.04.

¶ 37                                    F. Roti Responds and Replies

¶ 38   Roti filed a document responding to Jackson's motion for summary judgment and replying in support of its own motion, noting that the cross-motions meant the parties agreed that there were no factual issues in dispute. Roti argued that the Premises could not be used for indoor dining and that the doctrines of impossibility, impracticality, and frustration do not require that a business shut down completely to have a claim. Roti reiterated its reliance on *Levy* and distinguished *Deibler* on the basis that the lease therein did not restrict the tenant's uses of the premises.

¶ 39   Also, Jackimowicz's affidavit that other restaurants were operating in Chicago and the Building particularly did not refute Seamonds's affidavit that operating a restaurant pursuant to the public health orders is impossible and impractical. Noting that other businesses "have different physical setups, business models, and management decision-making," Roti argued that "those

other tenants *** may (for all the evidence will show) be operating illegally or dangerously." Thus, if the court did not grant summary judgment for Roti, it should allow discovery to address "the practices of other tenants."

¶ 40    As to the casualty provision in the Lease, Roti argued that Jackson's argument that it did not have insurance for COVID-19 was circular. "[W]hether Landlord obtained (or failed to obtain) insurance is beside the point—if it should have, its failure of performance cannot possibly be a justification to excuse abatement under this Lease." Moreover, the issue of whether property and casualty insurance covers COVID-19 was "still being litigated and depends on the unique provisions contained within each insurance policy. As such, it is premature for Plaintiff to state that COVID-19 is not a 'casualty.' " Roti noted that Jackson had not provided copies of its insurance policies and that Roti was a plaintiff in a pending case seeking to declare COVID-19 a casualty for insurance purposes. (In attached court documents from July 2020, Roti alleged in part that 31 of its restaurants were closed, 11 were open including 5 in Chicago, and the Chicago restaurants "remained open only for carryout and delivery service" and later "outdoor dining—at the severely limited capacities required by the" public health orders.) As to the Premises being tenantable, Roti reiterated its argument that the Premises were not "fit for full occupancy as indoor dining is still banned under Public Health Orders."

¶ 41                               G. Summary Judgment

¶ 42    The court held a hearing on the summary judgment motions on January 8, 2021, in which it heard no additional evidence but only arguments. After citing *Greenlee Foundries, Inc. v. Kussel*, 13 Ill. App. 3d 611 (1973), and *Smith v. Roberts*, 54 Ill. App. 3d 910 (1977), the court granted Roti's motion based on the doctrines of impossibility and frustration of purpose. It did not address Roti's argument that COVID-19 is a casualty under the Lease. The court indicated that the most relevant factor from its perspective was the lack of a *force majeure* clause in the Lease, which hurt

Jackson's arguments. The court noted that restaurants cannot make enough money to pay their staff during the governmental restrictions for COVID-19 and opined that restaurants would not be profitable until they could return to full operational capacity.

¶ 43    The court therefore entered an order granting summary judgment for Roti and denying Jackson's cross-motion. Its order provided that:

> "The lease between the parties remains in force and effect except that all rent payments by Roti *** are hereby abated in full under the doctrines of impossibility and frustration of purpose until such date as public health orders affecting the operations and capacity of restaurants in Chicago, Illinois due to the COVID-19 pandemic are lifted such that Roti *** is allowed to return to full operational capacity."

The court denied both parties' attorney fee requests so that "each party shall bear its own fees and costs in this matter," and it found that all claims between the parties had been resolved so that the order was enforceable and appealable. This appeal timely followed.

¶ 44                                    III. ANALYSIS

¶ 45    On appeal, Jackson contends that the trial court erred in granting summary judgment for Roti because (1) the doctrines of impossibility or commercial frustration do not excuse a restaurant from paying rent during the COVID-19 pandemic when public health orders never required restaurants to close and (2) the court excused Roti from paying rent though no provision of the Lease justified it. Roti responds that summary judgment was proper because (1) the doctrines of impossibility, impracticability, and frustration of purpose justified it, and (2) COVID-19 was a casualty under the Lease provision on fire and other casualties.

¶ 46                                 A. General Principles

¶ 47    Both plaintiffs and defendants may file for summary judgment. 735 ILCS 5/2-1005(a), (b) (West 2018). It should be granted only where the pleadings, depositions, admissions, and affidavits

on file show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* § 2-1005(c). Summary judgment may be granted on the issue of liability although there is a remaining issue as to the amount of damages. *Id.* A genuine issue of material fact precluding summary judgment exists where material facts are disputed or reasonable persons may draw different inferences from undisputed facts. *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 15. Because summary judgment is a drastic means of disposing of litigation, it should be granted only where the movant's right is clear and free from doubt. *Id.* Thus, we must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the nonmovant. *Id.* We review *de novo* a grant of summary judgment. *Id.*

¶ 48    "Affidavits in support of and in opposition to a motion for summary judgment *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013).

¶ 49    To establish a breach of contract, a plaintiff must prove (1) a valid and enforceable contract exists, (2) the plaintiff substantially performed the contract, (3) the defendant committed a breach of the contract, and (4) damages resulted. *Rocha v. FedEx Corp.*, 2020 IL App (1st) 190041, ¶ 95.

¶ 50                                    B. Casualty Under the Lease

¶ 51    We shall first address section 11.01 of the Lease, the casualty clause allowing for rent abatement under certain circumstances. We acknowledge the debate, herein and in other cases in various courts, as to whether the COVID-19 pandemic constitutes a casualty *for insurance purposes*. However, we find that the pandemic is not a casualty *for purposes of section 11.01 of the Lease*.

¶ 52    The purpose of the section is to address *physical* destruction or damage to the Building or Premises. Section 11.01 falls under the heading of "Destruction of Premises" and addresses what Landlord must do regarding repairing the Building after a casualty. If the damage from the casualty does not render the Building untenantable, Landlord must promptly repair it. If a substantial portion of the Premises or Building are rendered untenantable by the casualty, the Landlord must provide the Tenant an estimate of how long it will take for Landlord to effect repairs. If the repairs will take more than 180 days, Tenant can terminate the Lease. Absent such a termination, Landlord must proceed with the repairs. If the casualty renders the Premises untenantable and was not caused by the Tenant, rent is abated until the Landlord returns the Premises to the Tenant repaired and tenantable. Interpreting section 11.01 to read "casualty" broadly as including the COVID-19 pandemic, as Roti proposes, would require us to ignore the section's focus on *physical* casualities that require Landlord to repair the Premises or Building.

¶ 53              C. Impossibility, Impracticability and Frustration of Purpose

¶ 54    The doctrine of legal impossibility excuses performance of a contract only if performance is rendered objectively impossible because the subject matter of the contract is destroyed or by operation of law. *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 37. The doctrine applies only if the parties did not and could not anticipate the circumstances creating the impossibility, the party claiming impossibility did not contribute to the circumstances, and that party demonstrates that it has tried all available practical alternatives to allow performance. *Downs v. Rosenthal Collins Group, L.L.C.*, 2011 IL App (1st) 090970, ¶ 39. Impossibility excusing performance can arise from an intervening governmental regulation or order. *Rosenberger v. United Community Bancshares, Inc.*, 2017 IL App (1st) 161102, ¶ 24. The impossibility doctrine is "narrowly applied" because "the purpose of contract law is to allocate the

risks that might affect performance and *** performance should be excused only in extreme circumstances." *Id.* The party claiming impossibility has the burden of proving impossibility. *Id.*

¶ 55    "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261 (1981). A party is expected to make reasonable efforts to surmount obstacles to performance, and performance is excused only if it is impracticable despite reasonable efforts. *Northern Illinois Gas Co. v. Energy Cooperative, Inc.*, 122 Ill. App. 3d 940, 955-56 (1984) (citing Restatement (Second) of Contracts § 261 (1981)). "A party seeking to excuse his performance must show that he can operate *only* at a loss and that the loss will be so severe and unreasonable that failure to excuse performance would result in grave injustice." (Emphasis in original.) *Id.* at 956.

¶ 56    The doctrine of commercial frustration is an affirmative defense to the enforcement of a contract but "should not be applied liberally." *American National Bank v. Richoz*, 189 Ill. App. 3d 775, 780 (1989). The doctrine of frustration rests on the proposition that if, from the nature of the contract and the surrounding circumstances, the parties when entering into the contract must have known that it could not be performed unless some particular condition or circumstance would continue to exist, the parties must be deemed to have entered into the contract on the basis that the condition or circumstance would continue to exist, so that the contract is construed to be subject to an implied condition that the parties shall be excused if performance becomes impossible from such condition or circumstance ceasing to exist. *Id.* A party claiming frustration must show that (1) the frustrating event was not reasonably foreseeable and (2) the value of performance by the

nonclaiming party has been totally or nearly totally destroyed by the frustrating event. *Caravette v. Z Trim Holdings, Inc.*, 2011 IL App (2d) 110087, ¶ 51.

¶ 57    Here, as a threshold matter, we note that the Lease contains a *force majeure* provision of sorts. The Landlord can terminate the lease at its discretion if the Tenant abandons the premises for more than 90 days, except if the Tenant continues to pay rent and the absence is due to active remodeling, casualty, condemnation, or *force majeure*. Roti as Tenant thus cannot *abate* rent under this provision but merely avoid termination of the Lease by continuing to *pay* rent. As the section addresses only when the Lease can and cannot be terminated, we agree with Roti that section 3.02 is not a *force majeure* provision in the broader sense.

¶ 58    Turning to the doctrines of impossibility, impracticability, and frustration, we find no genuine dispute that the parties did not and could not anticipate the circumstances allegedly causing impossibility—the COVID-19 pandemic and the public health orders—when they entered into the Lease, nor that Roti did not contribute to the circumstances of the pandemic and said orders. Similarly, we find no genuine dispute that the allegedly frustrating event—again, COVID-19 and the orders—were not reasonably foreseeable when the Lease was formed.

¶ 59    However, we find that a genuine issue of material fact has been raised on a key point in Roti's affirmative defenses and counterclaim and its summary judgment motion. For Roti, Seamonds averred that it was impossible to operate a restaurant on the Premises, as provided in the Lease, in compliance with the public health orders. For Jackson, Jackimowicz averred that numerous restaurants were operating in the vicinity of the Building during the pandemic and that at least two restaurants, a Potbelly and Starbucks, were operating in the Building during the pandemic. Roti argues that we must accept Seamonds's statement as unrefuted by Jackimowicz's statement because Jackson did not move to strike Seamonds's statement as conclusory. However, we do not have to strike or disregard Seamonds's solemnly sworn statement to conclude that it

contains an assertion of fact that is duly countered by an assertion of fact solemnly sworn by Jackimowicz, in precisely the manner envisioned in section 2-1005. Each party has presented a statement establishing facts that we must accept but that, set against each other, establish that there is a genuine issue of material fact rendering summary judgment improper.

¶ 60     Accepting Seamonds's statement, one could reasonably conclude that Roti tried all available practical alternatives to perform under the Lease and that operating a restaurant on the Premises during the pandemic and subject to the Orders was impracticable despite reasonable efforts. However, performance must be *objectively* impossible. "The difference is between saying 'the thing cannot be done'—it is objectively impossible—and 'I cannot do it'—it is subjectively impossible." *Unite Here Health v. ML Plaza Owner, LLC*, No. 19 C 5314, 2020 WL 12441956, at *2 (N.D. Ill. Dec. 9, 2020) (citing Restatement (First) of Contracts § 455 (1932)). The facts in Jackimowicz's statement, that restaurants have been operating in the neighborhood of the Building and in the Building itself during the pandemic, refute Seamonds's statement. Someone was operating restaurants in and near the Building during the pandemic when the orders were in effect. This does not by itself establish that Roti's performance of the Lease—operating a restaurant on the Premises—in compliance with the public health orders was objectively possible or practicable with reasonable efforts, but it does tend to support such conclusions.

¶ 61     Factual issues of the circumstances under which Roti found operating under the public health orders impossible while other restaurants operated in the Building or neighborhood subject to the orders must be explored in the usual manner of litigation: discovery and possible trial. Roti may be able to show that its performance in compliance with the public health orders was impossible, impracticable, or frustrated, but it has not yet established that proposition clearly or

free from doubt. We must conclude that summary judgment for Roti was erroneous and that Jackson was also not entitled to summary judgment.

¶ 62                                IV. CONCLUSION

¶ 63    Accordingly, we reverse the judgment of the circuit court and remand for further proceedings on Jackson's complaint and Roti's affirmative defenses and counterclaim.

¶ 64    Reversed and remanded.

---

**No. 1-21-0138**

---

| | |
|---|---|
| **Cite as:** | *55 Jackson Acquisition, LLC v. Roti Restaurants, LLC*, 2022 IL App (1st) 210138 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-M1-705666; the Hon. Martin P. Moltz, Judge, presiding. |
| **Attorneys for Appellant:** | Adam K. Mortara, of Chicago, and Patrick Strawbridge, of Consovoy McCarthy PLLC, of Boston, Massachusetts, for appellant. |
| **Attorneys for Appellee:** | Lema A. Khorshid, William E. Meyer Jr., Vincent P. Formica, and Monika J. Malek, of Fuksa Khorshid, LLC, of Chicago, for appellee. |